May it please the Court, Herbert Capilone appearing on behalf of the appellant. Your Honors, we're looking at a Board of Immigration Appeals decision that appears to possibly apply the incorrect law, which what that decision states is that the respondent has failed to establish past persecution  law and she was not targeted on account of an actual or imputed political opinion. And I'll address the first issue briefly because I think that everything was pretty much fleshed out in the briefings. But we're looking at something where there's numerous case law in this circuit that the cases are far less extreme than the situation in the case at hand that has been found to be persecution. There are cases where, like this case, there has been just a threat of physical harm, and similar factual situations as well where the guerrillas have approached an individual who has then refused to join their forces and then the death threats appeared. And I don't see any case law that requires an actual physical harm to determine past persecution or any persecution at all. That's the first issue. The second issue is whether Ms. Aguirre suffered this persecution on account of her political opinion. And what occurred in this case is somewhat unique in that the guerrillas normally, and it's a standard practice that's evidenced in the state reports, indicating that it's a standard practice for the guerrillas to go to the university campuses to recruit people. And I'm not concerned with what their standard practice is. I'm concerned with what they did in Ms. Aguirre's case. And in her case, she is related to the individual who was running for president of Guatemala, who was eventually executed. And she had indicated in her testimony that she was associated with that political party. And she did, in fact, carry Mr. Carpio as the individual. She did carry his surname. The guerrillas approached her originally. Yes, it was on the campus, but it wasn't because she was on the campus. It was because of who she was. They questioned her as to her affiliation with that political party and in connection with her relationship with Mr. Carpio. And she essentially placated them. The persecution that she suffered increased as time went on. They sought her out at her home. At that point, she said, I'm getting out of here. I don't want to take the chance. At that point, she had told the guerrillas, I'll join your forces. At that point, she knew that if the guerrillas had actually approached her again, which they did attempt to do at her home, that they were going to be even more enraged because she had then told them that she was going to join their forces. Now, in terms of whether this is on account of her political opinion, there are numerous cases in this circuit that have addressed the issue of imputed political opinion and the idea that an individual, by refusing to join forces with the guerrillas, has stated an opinion by taking a neutral position. Ms. Aguirre was active in the campaign of Mr. Carpio, who was running for president. She was opposed to the guerrilla forces and what they stood for. She made that clear to them by stating that she refused to join them. Once she said, I'll join you, only because of the repeated harassment, then she was looking at a situation where she knew that there was going to be repercussions if she did, in fact, stay there. The last issue that is present in this case is whether Ms. Aguirre is actually threatened with any future harm in Guatemala. And the case law is clear on this, and that's been, again, fleshed out in the briefing, where at the initial hearing the INS did not do anything to substantiate or individualize the approach that was contained in the country reports. All they did was submit the country report saying that the situation has changed, and, in fact, the BIA has adopted the fact and found that she doesn't suffer, she's not threatened with any possible future harm. I think it's clear from the country reports themselves that there are still problems in Guatemala. I have clients come in every day who say they know people who are in a similar situation, and they go back to Guatemala never to be seen or heard from again. And this exists, whether they came to a peace accord back in 96 or 95, whenever it was, did not change the situation in Guatemala, the threat. Don't we have to deal with record evidence, though? And to the extent that it's the only evidence, apparently, the country report has to be given some dignity, does it not? Well, it also has to be given some kind of individualized critique. They can't just submit a country report, and the case law in this circuit is clear. Yeah, but you've got the burden here to establish that if he were to return to Guatemala, he would suffer persecution. Well, depending on ñ it depends what standard you're looking at. If you're looking at whether Ms. Aguirre has shown that she suffered past persecution, the burden then shifts to the INS to show that she would suffer future persecution. Okay. Now I'll reserve the remainder of my time. Thank you. May it please the Court. Josh Braunstein for the United States. As a preliminary matter, the petitioner argues at length that the indirect threats that she received during these recruitment efforts somehow constituted persecution and that they somehow by themselves compel the finding or the conclusion that she was persecuted. This is an error both in fact and in law, and the legal error is ñ and which shows that she is mistaken ñ is best articulated in this Court's decision in the Lim case, which both parties have cited. And in Lim, the Court stated in 2000, I believe, ìThreats standing alone, however, constitute past persecution in only a small category of cases, and only when the threats are so menacing as to cause actual suffering or harm.î Now, in this case, there were no direct threats at any time, and petitioner concedes as much in the reply brief. There was only discussions during the attempts to coerce her to join this movement, suggesting that bad things happen to people who fail to join and that she wouldn't want that to happen to her. Of course, she replied that she didn't. The Court in Lim added, and this is what I think is most obvious and evident here, is the Court added, ìFlipping the burden of proof every time an asylum applicant claimed she had been threatened would unduly handcuff the INS.î And I think that's the best articulation of the problem with the petitioner's insistence in the face of an adverse finding by the board and the immigration judge, a finding that, no, you are not, you did not show past persecution. And if you do not show past persecution, she is arguing now that the evidence actually compelled a finding that she did. Well, this Court's law suggests, or rather has found absolutely otherwise. She attempts to cast every action of these recruiters as an individual act of persecution, and, for example, argues that simply calling her by her own name during a meeting, after the first meeting at the bus stop, that that somehow was psychological persecution of itself. That's not the case. All there are are some indirect and indirect threats to her, which simply do not rise under this Court's precedent to persecution. All right. What about, then, there's also a claim of a well-founded fear of future persecution, right? I'm turning to that, Your Honor. And the answer is that the evidence is far from compelling the conclusion that she showed either that she had won, that the account of Prong is lacking, first and foremost. And the second, it is certainly the evidence does not compel the conclusion that a reasonable person in her situation would ten years after the fact and now some seven years after the peace accords would fear returning to Guatemala, particularly where the person is a low-level or was ten years ago a low-level, perhaps member, perhaps associate of a political group, and particularly where her mother has lived in Guatemala without any problem. So I want to go to the beginning of that, though, and say that the account of Prong is sorely lacking, and certainly the evidence does not compel a finding that any interest in her was in an attempt to overcome any political opinion she either expressed or they imputed to her. There is no evidence in the record that to these guerrillas, if they are guerrillas indeed, that this petitioner ever expressed any political opinion. Let me back up just a little bit now. If we would agree with you that the BIA's determination of no past persecution is correct, then there's no presumption of future persecution, right? Right, Your Honor. Now, in that context, who has the burden of going forward to do what? She maintains the burden at all times unless it's, as the Court notes in Nguyen, flipped to the INS, now DHS. The burden was never shifted here. There's not compelling evidence of persecution. There is no evidence of persecution, at least not any strong evidence of any kind of persecution, and certainly as we turn to then with the burden remaining with her, she would have to show that they were interested in her on account of her political opinion and that she feared reasonably some sort of future harm if she were to return. Well, as I started to say, there is no evidence that she expressed a political opinion. Indeed, she says that she expressed a political opinion by refusing to join, but the record evidence is clear. She agreed to join the guerrillas. She said at Record 91 that she lied, and I'm not quoting, that's paraphrasing. She lied, but she used the word lied, and told the men she would join their cause, and then she sought to buy some time in order to help her to get out of Guatemala at that time. That's her own testimony. But when they first met her, this group was not interested in her because of political opinion they thought she held. As a matter of fact, when they first encountered her, not only did she testify that she did not know them, but the first thing they said to her was, so are you a student here? They did not investigate her, as she says later on page 78 of the record. They had not investigated her. They asked her the preliminary question, and they did not greet her by name on the first meeting. And so this is probably no more than their, as counsel has suggested, this recruitment effort on a university campus, that they later found out her name and that it happened to be similar to a presidential candidate who, by the way, and I don't understand exactly that the petitioner is arguing that she was currently supporting Mr. Carpio in his presidential bid, but I'd like to make clear so that there's no question about it, the record is clear that before the first meeting with these potentially guerrillas, before the first meeting, Mr. Carpio had already been killed. He was at that time dead. The record at page 117 says he was killed in July of 93, and she says that the first meeting was not until August, so that they might be interested in her because of her support of this candidate. I don't think an inference can reasonably be drawn there, and certainly the evidence does not compel that conclusion. Even if, as counsel said, that she did refuse to join these men, the Supreme Court of the United States has very clearly spoken to that question, and a lot of the cases that are cited in Petitioner's Brief, several of them, the Arteaga case, I believe, and the Turcios case, these cases predate, if I'm not mistaken, Elias Zacharias, which the Supreme Court clearly said that simple refusal in and of itself does not mean that the attempt to recruit is an attempt to overcome a political opinion. And the court noted that a person can refuse to join for indifference, indecisiveness, or risk averseness for just some reasons. So, no, the court correctly found that she was not targeted on account of an actual or an imputed political opinion. Did she ever argue a kind of a mixed motive? I don't read a mixed motive argument into the case, but in one of the leading cases on mixed motives, in the Borja case, Judge O'Scanlan's dissent, I think, speaks. Well. Well, this dovetails. Keep talking. That's fine. Well, I think it, I really do think the language in that is instructive. You need to rely on Judge O'Scanlan's dissent. You can quote it. We'll be glad to hear it. Well, I don't, we don't need to rely on it, Your Honor, although it does, it is instructive as to the rather deferential standard. Certainly, even if counsel's inferences of the record evidence here are possible and inference to be drawn, certainly not even taken jointly could they be considered to be compelling evidence. I will point to Judge O'Scanlan's dissent as to the weight that this court accords to State Department reports, and I think that's significant here because considering that Judge Tashima, that you asked before about the burden shifting, considering that she did not ever get the burden to shift to the government, the question of the country reports or the situation in Guatemala is particularly relevant to whether she has an objectively reasonable, well-founded fear. And in Borja, Judge O'Scanlan wrote, this court has held that State Department reports are, quote, the most appropriate and perhaps the best resource for information on political situations in former nation. But our cases also, I think, say that, you know, a board can't just merely cite the report but it's got to relate it in a specific way to the case at hand, right? Pardon me, Your Honor. Yes, and if I could go over to answer that just for a minute. The cases that discuss that, that say there needs to be an individualized analysis, those are cases where the alien was given the presumption of a well-founded fear, where they had established past persecution. That's the reason I asked you that question earlier, right? The court has never said, never said, that State Department reports are not relevant in gauging whether the alien has a well-founded fear. And the Supreme Court points out identical language in the Ventura case, identical language to what exists in this case in the reports, even though these are earlier reports. At page 152 of the record, the Supreme Court says, points to this exact language and quotes it. In our experience, only party leaders or high-profile activists generally would be vulnerable to such harassment and usually only in their home communities. Thank you, counsel. Thank you. Mr. Kaplan. Thank you. There are several issues that I just want to clarify for the record. First, the threats that were made to Ms. Aguirre were implied. Yes, they were. But everyone knew what they meant. This was a standard practice for the guerrillas. Do they have to come up to someone and say, we'll kill you, you'll disappear, no one will ever see you again? I don't think that that is what's required by the law in this case. The fact that the guerrillas called Ms. Aguirre by name was intended to point out the fact that they knew about her. They knew of her involvement, her association with that campaign. They knew of her political opinions. No, Ms. Aguirre didn't have those guerrillas come into court and state that they approached her based on her political opinion. There's no way that she could do that. The circumstances indicate that maybe the first occasion where they didn't, the guerrillas did not pursue the issue. They let her go on her way. After that, after their investigation of hers, when the persecution started, the first contact she admits was just a contact. It was friendly. It wasn't threatening. They let her go on her way. Then they knew who she was, and that's when the persecution began. This case turns on the issue of whether Ms. Aguirre suffered past persecution. There was no evidence that was presented on the threat of future persecution, and if the court finds that Ms. Aguirre has suffered past persecution, then they don't even have to address it. You don't even have to address that. But in terms of the decisions from this court alone, in Ventura, which was a 2001 case, that was a case in Guatemala, just like this case, where the guerrillas had spray-painted three notes on the wall of the individual's home demanding that he join their forces and threatening that they would harm him if he didn't. I don't know how much closer you could get to that than this case. Molina, which was a 1999 case, was a case that held a woman who had received two threatening notes from the guerrillas. Threatening notes, and I don't recall exactly what they indicated, but one was two years apart from the first one. Nothing had happened in between that. That threatened retaliation against her family if she did not comply with the guerrillas' requests, and there was a finding that that individual had suffered past persecution. I don't know how we, the BIA has effectively made it impossible to meet that burden by insisting that there's some kind of physical harm or arrest. I think they've applied the wrong standard that's not supported by this court's findings. Thank you. Thank you, counsel. The case just argued is submitted for decision. That concludes the court's calendar for this morning, and the court stands adjourned.
judges: Schroeder, O'scannlain, Tashima